UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

JESSE ADELAAR,                                        :

                         Plaintiff,          :

          - against -                                 :

SPROUT FOODS, INC.,                             :

                     Defendant.        :

------------------------------------------------------------X

**MEMORANDUM**
**DECISION AND ORDER**

12 Civ. 3054 (FM)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/15/13

**FRANK MAAS**, United States Magistrate Judge.

I.     Introduction

        This suit arises out of several investments that plaintiff Jesse Adelaar

("Adelaar") and his sister made in defendant Sprout Foods, Inc. ("Sprout"). Adelaar

seeks to rescind those transactions based upon an alleged mutual mistake regarding the

rights that Sprout would furnish to them. On June 24, 2013, I denied Sprout's motion for

summary judgment because there were material issues of fact that needed to be resolved.

See Adelaar v. Sprout Foods, Inc., 2013 WL 3168663 (S.D.N.Y. June 24, 2013). A one-

day trial of this action took place the following day. Having considered the testimony and

exhibits introduced at that trial, I find that there was no agreement to give Adelaar the

"full-ratchet" antidilution protection to which he claims entitlement. Accordingly,

judgment shall be entered for Sprout.

II.     Trial Testimony

At trial, the two sides presented dramatically different versions of the events leading to the Adelaars' investment in Sprout.  Adelaar testified that both he and his father are involved in the investment field.  (Tr. 4, 6).[1]  Although his father's credentials were not disclosed, Adelaar has an undergraduate degree in finance and accounting, worked for more than four years as a research analyst at McDonald Investments (later acquired by Key Bank), and also spent an additional eight years or so at the institutional investment firm of ForstmannLeff, which later was spun off into a firm known as Peconic Partners.  (Id. at 3-5).  He continues to serve as a consultant to Peconic Partners.  (Id. at 4).

In 2008, Adelaar learned of Sprout through discussions with Max MacKenzie ("MacKenzie"), then Sprout's Chief Executive Officer, who was married to Adelaar's first cousin.  (Id. at 5-6).  Their conversations eventually led to a decision by Adelaar and his sister to make an initial purchase of $500,000 of Sprout Series A Preferred Shares in May 2009.  (Id. at 11-12).  Adelaar subsequently purchased additional Sprout shares in the "A," "B" and "C" financings.[2]  (Id. at 12; Def.'s Ex. 38).

At trial, Adelaar testified that he requested additional protection from Sprout in the form of a side letter agreement ("Side Letter") at the time of his initial

_____

[1]     "Tr." refers to the trial transcript.  (ECF No. 51).

[2]     All of the shares that Adelaar and his sister purchased through Sprout's offerings were restricted shares for which there is no public market.

investment in the Series A Preferred Shares. (Tr. 15-18). Adelaar did so at the behest of his father, who used the term "most favored nation" to describe the benefit that Adelaar and his sister should seek. (Id. at 13-14). According to Adelaar, his father's request was tantamount to a request for full-ratchet antidilution protection. (Id.). As Adelaar explained, the concept was that if Sprout "were to ever issue more equity at a lower price than we paid . . . [,] we were to be made whole" through the issuance of additional shares so that "the initial principal . . . invested would never decline." (Id. at 14).

MacKenzie, whose testimony was received in the form of a deposition, agreed that Adelaar had requested full-ratchet antidilution protection. (MacKenzie Dep ("Dep.") at 8). Curiously, although Adelaar apparently conceded that he did not use the term "full-ratchet antidilution" in the course of his discussions with MacKenzie, MacKenzie suggested during his deposition that Adelaar "had [], in fact, requested full ratchet," stating, in substance, that Adelaar wanted "some protection against down rounds or adverse events in the future as a requisite for their investment." (Tr. 15-17; Dep. 16, 79, 81-82). MacKenzie testified further that Sprout agreed to give Adelaar full-ratchet antidilution protection at the time of his first two investments in Sprout Series A Preferred Shares, and that he communicated this "intention" to either Andrew Samaan or Greg Torborg, Sprout's outside counsel. (Dep. 23-25, 50). According to MacKenzie, the Adelaars were the only investors who received full-ratchet antidilution protection while

3

he was affiliated with Sprout. (Id. at 51-52, 62). MacKenzie left Sprout's employ in

January 2011. (Tr. 89-91).[3]

The Side Letter that Sprout sent to Adelaar, and that Adelaar signed, states,

insofar as relevant:

> in the event that the Company shall issue or sell additional
> shares of Stock for a consideration per share less than the
> Purchase Price on the Effective Date . . . , the Purchase Price
> shall be reduced, concurrently with such issue, to a Purchase
> Price equal to the net consideration per share of Stock
> received by the Company in respect of such issuance.

(Def.'s Ex. 1, ¶ 1). Because the term "Stock" is defined in the Side Letter as Sprout

"Series A Preferred Stock," (id. at 1), the two sides agree that the Side Letter did not, in

fact, afford Adelaar and his sister any antidilution protection with respect to later rounds

of financing. (See Tr. 39, 45, 95). Adelaar maintains that this is a scrivener's error. (Id.

at 39).

Two witnesses called by the defense testified, in substance, that the Side

Letter accurately reflects the limited protection that Sprout agreed to provide to Adelaar.

The first, Andrew Samaan, was the attorney who drafted the Side Letter.[4] (Tr. 149).

Samaan testified that MacKenzie had instructed him during a telephone call to draft an

agreement that provided full-ratchet antidilution protection only with respect to the "A"

---

[3]     The two sides disagree as to the precise circumstances leading to MacKenzie's
departure. Sprout maintains that he was terminated. (Id. at 89-91). MacKenzie claims that he
resigned at Sprout's request. (Dep. 25).

[4]     Samaan is the brother of Peter S. Samaan, who served as trial counsel to Sprout.
The two brothers are affiliated with different law firms. (Tr. 147).

round of financing.  (Id. at 150).  As Samaan explained, had MacKenzie asked him to draft language affording Adelaar such protection across all future classes of stock, he would have asked MacKenzie "if he had approval from the board," and, if not, "would have advised him to go to the board or . . . would have gone to the board" himself.  (Id. at 151).  Samaan testified that he never, in fact, approached the Sprout board of directors to seek approval for full-ratchet antidilution protection across all future classes of stock. (Id.).

The second defense witness, David Schiff (more commonly known as "Scotty"), testified that his family invested approximately $1 million in the "B" round of financing, in return for which he was only able to secure "most favored nation" protection.  (Id. at 125-26, 130, 138).  Before investing in Sprout, Schiff questioned MacKenzie extensively as to whether any other investor had "any kind of protection or benefit" not afforded to his family.  (Id. at 124-26).  MacKenzie assured him that there were no such agreements.  (See id. at 126-27).  Schiff characterized the full-ratchet antidilution protection that Adelaar later claimed to have negotiated as an "absolutely extraordinary" benefit that would have permitted Adelaar and his sister to have "all the upside and no downside."  (Id. at 128-29).[5]

---

    [5]    Under full-ratchet antidilution protection, an adjustment is made based on a subsequent lower price per share without regard to the number of shares purchased in the new offering.  For example, if a Series B preferred share offering had been made at $.50 per share, Adelaar and his sister would have been entitled to twice the number of Series A preferred shares as a consequence of their initial investment, even if only 100 new Series B shares were issued. More commonly, antidilution protection is offered on a weighted average basis that takes into

(continued...)

III.    Findings of Fact

Faced with this conflicting testimony, I find Sprout's version of the negotiations preceding the Adelaars' investments considerably more credible. At the outset, if Adelaar had arranged with Sprout a benefit as extraordinary as full-ratchet antidilution protection, MacKenzie presumably would have disclosed it to Schiff in response to his pointed inquiries. MacKenzie's failure to do so, combined with his failure to seek the approval of the Sprout board of directors, strongly suggests that he had not agreed on behalf of Sprout to grant Adelaar and his sister full-ratchet antidilution protection across all classes of stock.

Second, in his deposition testimony, MacKenzie was unable to recall significant details of the events leading up to the Side Letter. For example, he was unable to say whether he had communicated the terms of Adelaar's proposed investment to Samaan or Torborg by email or verbally. (Dep. 51). This stands in marked contrast to Samaan, who testified without hesitation that MacKenzie had communicated to him by telephone that Adelaar wanted "price protection" within the Series A offering, not across all classes of stock. (Tr. 150, 152-53). If MacKenzie had capitulated to Adelaar's request for full-ratchet antidilution, one would think that he would recall how he had conveyed the need for that unusual arrangement to counsel.

---

[5](...continued)
account the amount of money raised as part of the subsequent offering. (See id. at 165); Joseph W. Bartlett, There Are Two Ways To Formulate Antidilution Provisions – Full-Ratchet and Weighted Average, VC Experts, https://vcexperts.com/buzz_articles/1339.

Third, to credit Adelaar's testimony, I would have to conclude that, at the time, neither Adelaar nor MacKenzie noticed that the Side Letter provided Adelaar with far less protection than he had negotiated for himself and his sister. This seems unlikely. Nonetheless, during his testimony, in an effort to convince me that this is in fact what occurred, Adelaar sought to downplay his level of sophistication concerning the significance of defined contractual terms. Thus, Adelaar alleged on cross-examination that he was unfamiliar with the concept of a defined term at the time that he made his initial investment in Sprout. (Id. at 45). Indeed, when Adelaar was asked whether he had ever encountered a defined term in the course of reviewing 10-Ks and 10-Qs and other public documents, he responded, "I couldn't possibly testify to that. I don't remember all the documents that I've read." (Id. at 45-46).

Given the considerable length of time that Adelaar has worked in the investment field, this testimony regarding defined terms permits only one of two inferences: either Adelaar was not so sophisticated at the time of his investment that he would have appreciated and been able to communicate effectively to MacKenzie his desire for full-ratchet antidilution protection across all classes of stock, or he was intentionally seeking to mislead the Court in an attempt to avoid the plain language of the deal that he negotiated. In either circumstance, the conclusion necessarily is the same: Adelaar did not, in fact, ask MacKenzie for the extraordinary protection that he now says was crucial to his and his sister's initial investment.

In any event, even if I were to find that Adelaar did ask MacKenzie for full-ratchet antidilution protection across all classes of stock, MacKenzie apparently did not understand what Sprout was being asked to provide. Although MacKenzie testified to the contrary after he left the company, by that time he had an axe to grind. For that reason, I do not credit MacKenzie's testimony to the extent it conflicts with Samaan's testimony that MacKenzie had requested full-ratchet antidilution protection for Adelaar only within the Series A preferred stock offering.

III.    Conclusions of Law

As noted above, the two sides agree that the Side Letter, as written, affords Adelaar protection only with respect to the Sprout Class A Preferred Shares offering. The parol evidence rule therefore ordinarily would bar either party from offering extrinsic evidence of a prior oral or written understanding in an attempt to modify or contradict this unambiguous provision. See Morgan Stanley High Yield Secs., Inc. v. Seven Circle Gaming Corp., 269 F. Supp. 2d 206, 213-14 (S.D.N.Y. 2003) (applying New York law), There is, however, an exception to the parol evidence rule that applies when a party seeks to reform a contract on the basis of mutual mistake. Capparelli v. Vitiritti, 643 N.Y.S.2d 656, 658 (2d Dep't 1996) (citing Brandwein v. Provident Mut. Life Ins. Co. of Philadelphia, 3 N.Y.2d 491, 168 N.Y.S.2d 964, 146 N.E.2d 693 (1957)). Here, Adelaar seeks to invoke that exception to the rule. Nevertheless, the credible evidence shows that Samaan did not make a mistake in memorializing the terms of the agreement that had been conveyed to him by MacKenzie. There consequently was no mutual mistake, and

Adelaar and his sister have no basis to reform the Side Letter, much less unwind their investments in Sprout.

IV.   Conclusion

This Memorandum Decision and Order sets forth my findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.  For the reasons set forth, I find that there was no mutual mistake concerning the protections the Adelaars would be offered.  The Clerk of the Court is therefore directed to enter judgment for Sprout and to close this case.

SO ORDERED.

Dated:        New York, New York
              November 14, 2013

                                    _____
                                    FRANK MAAS
                                    United States Magistrate Judge


Copies to all counsel via ECF